UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF WASHINGTON

In re:

GOLD DIGGER APPLES, INC.,

Debtor.

Case No. 16-01783-FPC7

**NOT FOR PUBLICATION**

MEMORANDUM DECISION RE: U.S. BANK'S OBJECTIONS TO CLAIMS

## 1. BACKGROUND

U.S. Bank National Association ("U.S. Bank") objected to five PACA[1] claims and three purchase money secured claims made by fruit growers against Gold Digger Apples, Inc. ("Gold Digger"), an insolvent agricultural cooperative association that filed a chapter 7 bankruptcy petition on May 26, 2016. U.S. Bank is Gold Digger's largest creditor and holds a blanket security interest in virtually all of

---

[1] Perishable Agricultural Commodities Act, 7 U.S.C. §§ 499a–499t (2000).

MEMORANDUM DECISION . . . ~ Page 1

Gold Digger's assets. If U.S. Bank prevails in its objections, assets otherwise available for the benefit of the fruit growers will be available for U.S. Bank.

At a hearing held on January 19, 2017, the court heard testimony of Tyler J. Boswell, the chief accountant for Chelan Fresh Marketing ("Chelan Fresh"); Miguel Alvarado, a manager of Alvarado Orchards, LLC; Gary Azzano, the principal officer and owner of Azzano Farms, Inc.; Rigoberto Guzman, a general partner of Five Star Orchard and R&B Orchard; Roni DeVon, a certified public accountant who worked for Gold Digger and has provided assistance to Gold Digger's bankruptcy trustee; Greg I. Moser, Gold Digger's former general manager; and Jack Nelson, the chairman of Gold Digger's Board of Directors.

From the evidence presented, the court finds that each grower delivered to Gold Digger all the fruit they grew and harvested. Gold Digger then issued each grower a "receiving ticket" showing the number of bins of each type of fruit that the grower delivered. The grower did not present any type of invoice to Gold Digger. Rather, the grower *received* a ticket evidencing the amount of the perishable commodity that was delivered to be packed and processed by Gold Digger. From the time the fruit was delivered to Gold Digger, all packing, handling, and storing of the fruit was performed by Gold Digger.

After Gold Digger packed the fruit, it gave the grower a "grower packout" showing the number of boxes packed by variety, pool, size, and grade. The fruit

from different growers was combined and stored. The fruit was then marketed by Chelan Fresh.[2] After Chelan Fresh sold the fruit, Chelan Fresh deducted its commission from the net proceeds and the remaining funds went to Gold Digger. Gold Digger then deducted its costs of packing and storing. U.S. Bank had a first position lien in Gold Digger's right to the packing and storing charges, and the remaining net proceeds were paid to the growers based on the amount of fruit delivered to Gold Digger. According to the terms of the agreements that Gold Digger had with the growers, Gold Digger was required to account to each grower for the proceeds of sales of pooled fruit on a pro rata basis with fruit of like quality, grade, kind, size, and condition.

Gold Digger accounted for the fruit delivered; however, and unfortunately, Gold Digger did not pay the growers all of what they were owed. As a result, the growers filed proofs of claim and some of those claims were objected to by U.S. Bank. The claims subject to U.S. Bank's objection include:

---

[2] Gold Digger had a Marketing Contract with Brewster Heights Packing & Orchards, LP (Gebbers Farms) with a consent to Gebbers Farms to use Chelan Fresh on a consignment basis as the exclusive sales agent to market, sell, and ship the fruit delivered by the Gold Digger growers and packed and processed by Gold Digger. *See* Claim No. 57, Part 2; *see also* DeVon Decl., ECF No. 228, ¶ 6; Boswell Decl., ECF No. 229, ¶¶ 4 and 9.

| Claimant | Claim No. | Proof of Claim Amount[3] | Amended Proof of Claim Amount[4] | GAE Amount[5] | Claim Type |
|---|---|---|---|---|---|
| Azzano Farms, Inc. | 32 | $82,043.96 | | $77,148.57 | PMSI[6] |
| David Ramos | 40 | $93,887.59 | $106,495.87 | $106,495.87 | PACA |
| Five Star Orchard | 43 | $13,108.85 | $15,211.71 | $15,211.71 | PMSI |
| Santos Alvarez | 53 | $9,544.51 | $9,544.51 | $4,172.68 | PACA |
| Alvarado Orchards, LLC | 54 | $91,486.96 | $91,486.96 | $12,839.26 | PMSI |
| Austin Orchard | 56 | $655.52 | $1,651.27 | $1,651.27 | PACA |
| Elias Sandoval | 57 | $21,841.93 | $23,423.12 | $23,423.12 | PACA |
| Parm Dhaliwal[7] | 62 | $2,553.16 | | $2,515.41 | PACA |

---

[3] The claims bar date was September 1, 2016. [ECF No. 12]. The original proof of claim for each of the eight claimants was filed on or before the claims bar date. [Claim Nos. 32-1, 40-1, 43-1, 53-1, 54-1, 56-1, 57-1 & 62-1].

[4] The amended proofs of claim were filed after the claims bar date. The amended claim of David Ramos was filed on November 17, 2016 [Claim No. 40-2]; the amended claim of Five Star Orchard was filed on November 17, 2016 [Claim No. 43-2]; the amended claim of Santos Alvarez was filed on October 19, 2016 [Claim No. 53-2]; the amended claim of Alvarado Orchards, LLC was filed on October 19, 2016 [Claim No. 54-2]; the amended claim of Austin Orchard was filed on November 18, 2016 [Claim No. 56-2]; and the amended claim of Elias Sandoval was filed on November 17, 2016 [Claim No. 57-2].

[5] "GAE Amount" is the name the parties have given to the amounts due growers as set forth in the grower claim report prepared by Ms. DeVon. The GAE Amounts were calculated by Ms. DeVon after reviewing Gold Digger's business records and agreements. [ECF No. 275, Ex. A].

[6] Purchase Money Security Interest.

[7] Claimant Parm Dhaliwal was originally represented by the attorney representing the other two PMSI Claimants, but was *pro se* at the time of the hearing.

## 2.  **PACA CLAIMS**

U.S. Bank disputes the PACA claims of David Ramos, Santos Alvarez, Austin Orchard, Elias Sandoval and Parm Dhaliwal (the "Non-Member Growers").[8] If the PACA claims are valid, then the Non-Member Growers' claims to Gold Digger's assets are ahead of all other creditors, including U.S. Bank. If the Non-Member Growers failed to preserve their status as PACA trust claimants, then their claims would be treated as unsecured and would be paid after secured creditor U.S. Bank.[9]

Specifically, U.S. Bank disputes whether the PACA notices were sufficient to preserve the Non-Member Growers' rights as PACA trust beneficiaries. U.S. Bank asserts that the PACA notices were not timely and failed to provide the requisite information.

The Non-Member Growers assert notice was sufficient because each signed a Grower's Marketing Contract ("Non-Member Grower Contract") with Gold Digger and that contract included a declaration of intent to preserve PACA rights. In addition, invoices sent to the buyers of the fruit were printed with the required PACA preservation language.

---

[8] Unlike the PMSI Claimants, the PACA claimants were not members of the Gold Digger cooperative association.

[9] The court notes that although there are five PACA claims at issue, each of the disputed PACA claims are subject to substantially the same arguments and defenses. Thus, the analysis will not differentiate the five different PACA claims.

## 2.1  **History of PACA.**

PACA was enacted in 1930 to prevent unfair business practices and promote financial responsibility in the fresh fruit and produce industry. *See Sunkist Growers, Inc. v. Fisher*, 104 F.3d 280, 282 (9th Cir. 1997). PACA has undergone several revisions because "[u]nfortunately, PACA as originally drafted was unable to provide complete protection to sellers." *Middle Mountain Land & Produce Inc. v. Sound Commodities Inc.*, 307 F.3d 1220, 1223 (9th Cir. 2002). This is because produce buyers usually purchased the grower/seller's perishable agricultural commodities on credit, and then if the buyer went bankrupt, the grower/seller usually had "no meaningful possibility of receiving . . . payment." *Middle Mountain Land*, 307 F.3d at 1223-24. Therefore, recognizing the public interest served by the nation's food suppliers—its farmers—Congress amended the statute in 1984 to further protect grower/sellers by establishing the PACA trust which elevated the claims of PACA trust beneficiaries ahead of all creditors, even secured creditors. *Bowlin & Son, Inc. v. San Joaquin Food Serv., Inc. (In re San Joaquin Food Serv., Inc.)*, 958 F.2d 938, 939 (9th Cir. 1992).[10] The PACA trust requires all commission

---

[10] The House Report addressing the legislation that ultimately became the 1984 PACA amendments made it clear that the purpose was to "increase the legal protection for unpaid sellers and suppliers of perishable agricultural commodities until full payment of sums due have been received by them." H.R. REP. NO. 98-543 (1983), reprinted in 1984 U.S.C.C.A.N. 405. Congress recognized the risks and hardships inherent in being a grower and shipper of perishables and the possibly irreparable harm resulting when an insolvent purchaser cannot pay the grower. *See id.* Congress stated "The process of growing, harvesting, packing and shipping perishables is a real gamble; costs are high, capital is tied up in farm land and machinery, and returns are delayed until

merchants, dealers, or brokers to hold all perishable commodities purchased on short-term credit, as well as sales proceeds, in trust for the benefit of unpaid sellers until full payment is made. 7 U.S.C. § 499e(c)(2); *see also Perfectly Fresh Farms, Inc. v. U.S. Dep't of Agric.*, 692 F.3d 960, 967 n.6 (9th Cir. 2012); *San Joaquin Food Serv., Inc.*, 958 F.2d at 939. Importantly, "the trust *automatically arises in favor of a produce seller* upon delivery of produce." *C & E Enters., Inc. v. Milton Poulos, Inc. (In re Milton Poulos, Inc.*) 947 F.2d 1351, 1352 (9th Cir. 1991) (emphasis added). PACA trusts are governed by traditional principles of trust law, and property subject to the trust is excluded from property of the bankruptcy estate. *Boulder Fruit Express & Heger Organic Farm Sales v. Transportation Factoring, Inc.*, 251 F.3d 1268, 1271 (9th Cir. 2001) (*citing Sunkist Growers, Inc.,* 104 F.3d at 282). Because of PACA, the PACA trust beneficiaries "are granted statutory priority in repayment, even senior to secured creditors." *Sysco Food Services of Seattle, Inc. v. Country Harvest Buffet Restaurants, Inc. (In re Country Harvest Buffet Restaurants, Inc.)*, 245 B.R. 650, 652 (B.A.P. 9th Cir. 2000).

---

the crop is sold. If the grower-shipper cannot realize any returns on the sale of the crop when due, he may not be able to survive. Thus, where business failures or reorganizations occur on the part of buyers of their crop, *the growers are usually the parties least able to withstand* the losses and inevitable delays which result from such actions." *Id.* (emphasis added). Congress also noted that "in recent years, there has been a substantial increase in instances where commission merchants, dealers or brokers have failed to pay for perishable agricultural commodities received by them or have been slow in making payment therefor." *Id.*

MEMORANDUM DECISION . . . ~ Page 7

The court acknowledges that PACA is a remedial statute,[11] and therefore should be interpreted broadly to accomplish it goals. *See, e.g.*, *Florida Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 38 (2008) ("remedial statute[s] . . . should be liberally construed"). One of PACA's goals is to protect the small farmer. *See O'Day v. George Arkakelian Farms, Inc.*, 536 F.2d 856 (9th Cir. 1976). The Non-Member Growers in this case are exactly the type of small farmers this statute was meant to protect.

## 2.2 Notice of intent to preserve PACA rights.

A crucial element for a PACA claim is providing notice of intent to preserve PACA rights.[12] PACA notices can come in two forms. First, a written notice within thirty (30) calendar days after expiration of the time in which payment must be made (the "Written Notice Method"). *See* 7 U.S.C. § 499e(c)(3). Second, a printed statement on invoices (the "Invoice Method"). *See* 7 U.S.C. § 499e(c)(4). The parties disagree about whether the notice given in this case complies with the statute and is sufficient to preserve the Non-Member Growers' PACA trust rights. The Non-Member Growers assert that notice was sufficient to preserve the benefits of the PACA trust as both notice methods were employed. U.S. Bank, on the other hand,

---

[11] *See Sunkist Growers, Inc.*, 104 F.3d at 280*; Middle Mountain Land*, 307 F.3d at 1220; *In re Southland + Keystone*, 132 B.R. 632, 638 (B.A.P. 9th Cir. 1991).

[12] *See In re Country Harvest Buffet Restaurants, Inc.*, 245 B.R. at 653 (listing the requirements to "become a perfected PACA trust beneficiary"). In this case, notice is the only requirement in dispute.

MEMORANDUM DECISION . . . ~ Page 8

argues that notice was not sufficient because the notice was not timely and it did not contain the required information.

### 2.2.1  Written Notice Method.

The Non-Member Growers assert that they have satisfied the Written Notice Method by individually entering into a Non-Member Grower Contract with Gold Digger. Specifically, the contract contained a clause declaring the grower's intent to preserve PACA trust rights.[13] U.S. Bank makes two arguments as to why the PACA notice section of the Non-Member Grower Contract cannot serve as sufficient PACA notice.[14]

First, U.S. Bank argues that the notice fails because it does not include all the information required by the statute or the regulations. The court disagrees. The

---

[13]  The language in the Non-Member Grower Contracts signed by each of the Non-Member Growers vary slightly, however, the section entitled "Perishable Agricultural Commodities Act (PACA)/Notice Waived" is the same in each and provides:

> To the extent allowed by law, the Grower asserts any and all rights and benefits granted to Grower pursuant to the Perishable Agricultural Commodities Act (PACA), 7 U.S.C. The parties specifically agree that the fruit/crops and any proceeds thereof received from the sale of such fruit/crops shall be subject to and shall preserve the trust benefits granted to Grower pursuant to the Perishable Agricultural Commodities Act (PACA), 7 U.S.C. et seq. [Gold Digger] acknowledges receipt of all required notices from the Grower to preserve the trust benefits, and specifically waives the requests for any such notices in the future to preserve the trust benefits for the Grower, and, further for the enforcement of such trust benefits as set forth in 7 U.S.C. §499(e). The Company [Gold Digger] acknowledges that, upon execution of this agreement, the Grower has so complied with all requirements to preserve the benefits of the trust specified in 7 U.S.C. §499(e).

[14]  The court notes that the parties did not provide case law on point nor has the court found binding authority as to whether a contract provision may serve as sufficient notice to preserve PACA trust rights when a grower is dependent upon another party to contract and sell his fruit.

MEMORANDUM DECISION . . . ~ Page 9

relevant PACA statute requires only that the unpaid seller give "written notice of intent to preserve the benefits of the trust to the commission merchant . . . in sufficient detail to identify the transaction subject to the trust." 7 U.S.C. § 499e(c)(3). That is all the statute requires. Nothing in the PACA statute requires that the notice contain all of the information outlined in 7 C.F.R. § 46.46(f). *See United States v. Caceres*, 440 U.S. 741, 749 (1979) (explaining that a court must enforce agency regulations when compliance is "mandated by the Constitution or federal law"). In this case, the Non-Member Growers (the unpaid sellers) gave notice to Gold Digger (the commission merchant) of their intent to preserve PACA trust rights by signing the Non-Member Grower Contract.

Second, U.S. Bank argues that the notice was not timely. U.S. Bank argues both that the notice was too early and too late. As to the too early argument, U.S. Bank seems to assert that the notice fails because it is preemptive. Essentially, U.S. Bank asserts that the notice was premature because it sought to preserve trust rights that did not exist. During the hearing, U.S. Bank attempted to obtain testimony demonstrating that each Non-Member Grower signed the Non-Member Grower Contract prior to ever delivering fruit to Gold Digger. If this was true, then it could be argued that there would be no PACA trust at the time of the notice because the PACA trust did not arise until Gold Digger, as a commission merchant, received the perishable agricultural commodity. *See* § 499e(c)(2). This argument, however, was

MEMORANDUM DECISION . . . ~ Page 10

16-01783-FPC7    Doc 418    Filed 02/07/17    Entered 02/07/17 08:27:25    Pg 10 of 35

1   contradicted by the testimony of Roni DeVon. Ms. DeVon testified that

2   Mr. Ramos's Non-Member Grower Contract was signed *after* the delivery of his

3   fruit to Gold Digger. Given Ms. DeVon's testimony and the assertions by the Non-

4   Member Growers that their contracts were signed after delivery of fruit to Gold

5   Digger, and because U.S. Bank failed to present any evidence to the contrary, the

6   court finds that the notice was not premature and the Non-Member Growers timely

7   notified Gold Digger of their intent to preserve PACA trust rights.[15]

8         U.S. Bank also argues that in order to comply with the Written Notice

9   Method, each Non-Member Grower would have had to determine when each piece

10  of their fruit was sold and then issue an additional notice of intent to preserve PACA

11  rights to Gold Digger within thirty (30) days. To the extent that U.S. Bank argues

12  that the Non-Member Growers were obligated to give subsequent and repeated

13  notices to Gold Digger after every piece of their fruit was sold, the court finds that

14  U.S. Bank's argument is contrary to the language and intent of the statute. Indeed,

15  § 499e(c)(3) did not contemplate, and is not applicable, to the facts of this case and

16  the type of relationship that existed between these parties.

17

18  _____
    [15] Even if the facts were different, and the notice was provided before fruit was delivered, the court
19  is not ready to agree with U.S. Bank that the notice was too early. By analogy, mortgages are
    sometimes signed by homeowners prior to the homeowners taking title to the property being
    pledged, but the mortgages subsequently become valid when the homeowners take title. Because
20  the court finds that fruit was delivered before the notice was issued, it need not, and does not,
    render an opinion on the consequences of issuing the notice shortly before the delivery of fruit.

1    The language of the relevant PACA statute at 7 U.S.C. § 499e(c)(3) highlights

2    the difficulty when applied to these facts. Specifically, § 499e(c)(3) provides in

3    relevant part that the "unpaid supplier, seller, or agent," in preserving its rights under

4    PACA, is required to provide written notice of its intent to preserve the benefits of

5    the trust to the

6           commission merchant, dealer, or broker within thirty
             calendar days (i) after expiration of the time prescribed by
7           which payment must be made, as set forth in regulations
             issued by the Secretary, (ii) after expiration of such other
8           time by which payment must be made, as the parties have
             expressly agreed to in writing before entering into the
9           transaction, or (iii) after the time the supplier, seller, or
             agent has received notice that the payment instrument
10          promptly presented for payment has been dishonored.

11           From the statutory language, it appears that this section of the statute applies

12   to *sales transactions* between the grower and a commission merchant. Because, in a

13   sales transaction, the grower/seller would know exactly when the fruit was sold and

14   the grower would be invoicing the commission merchant for the sale of the fruit. In

15   this case, the evidence and testimony presented established that Gold Digger never

16   took title to the Non-Member Growers' fruit. Rather Gold Digger packaged and

17   stored the fruit for the Non-Member Growers. When Gold Digger's marketing agent,

18   Chelan Fresh, found a buyer for the fruit, the payment terms of the sale were never

19   more than thirty (30) days. All aspects of the sale of the fruit, including procuring

20   buyers, setting terms, invoicing the sales, and collecting payment, rested exclusively

1  with Chelan Fresh. The Non-Member Growers possessed neither rights related to

2  nor knowledge about any of those activities. The only information Non-Member

3  Growers received were receiving tickets showing the number of bins of each type of

4  fruit delivered to Gold Digger. Thus, obligating the growers to monitor and invoice

5  the sales of their fruit after delivering it to Gold Digger, while presumably possible,

6  is not practicable.

7          Additionally, U.S. Bank's timing of the additional notice (even if the court

8  found it was required) is misguided. U.S. Bank argues that the thirty (30) days

9  begins to accrue upon delivery of the fruit to Gold Digger by the grower. However,

10 this is not consistent with the language of the statute. According to the statute, the

11 timeliness of the notice of intent to preserve PACA rights depends on the date in

12 which the "*payment must be made*" and this depends upon the date in which the

13 "*account is receive*d," not necessarily delivery of the fruit. 7 C.F.R. § 46.46 (e)(1); 7

14 C.F.R. § 46.2(aa)(2) (emphasis added). In this case, testimony established that Gold

15 Digger and the Non-Member Growers did not expressly agree to a time for payment

16 in writing before entering into a transaction, therefore paragraph (c)(3)(ii) does not

17 apply. Furthermore, paragraph (c)(3)(iii) does not apply as there is no evidence that

18 the notice at issue occurred when a "payment instrument promptly presented for

19 payment has been dishonored." Therefore, only paragraph (c)(3)(i) arguably applies

20 to this case and payment was due when fruit was sold to the ultimate buyer. That

time, not the time of delivery to Gold Digger, would be the applicable tracking point.

Pursuant to the language of the statute, the evidence presented, and the intent of the parties, the court finds the Non-Member Growers properly notified Gold Digger of their intent to preserve their PACA rights. The court fails to see any policy goal that would be furthered by determining that the PACA claimants' notice set forth in the Non-Member Grower Contract does not satisfy the PACA statutory requirements. The allowance of the Non-Member Growers' claims is consistent with PACA.[16]

---

[16] The Department of Agriculture clarified that it was not the intent of the statute or regulations to penalize growers when payment is received after thirty days by amending 7 C.F.R. § 46.46 in 2011. These amendments were accompanied by a Department of Agriculture notice of rulemaking, titled "Perishable Agricultural Commodities Act: Impact of Post–Default Agreements on Trust Protection Eligibility." 76 F.R. 20217–01. In its 2011 rulemaking, the Department of Agriculture stated:

> (USDA) is amending the regulations under the Perishable Agricultural Commodities Act (PACA) to allow, if there is a default in payment as defined in the regulations, a seller, supplier, or agent who has met the PACA trust eligibility requirements to enter into a scheduled agreement for payment of the past due amount without foregoing its trust eligibility. USDA is also amending 7 CFR 46.46(e)(2) by adding the words "prior to the transaction." This change clarifies that the 30–day maximum time period for payment to which a seller can agree and still qualify for coverage under the trust refers to pre-transaction agreements.

*Id.* at 20217. Further, citing *American Banana, Patterson Foods*, and other cases, the USDA explained that in recent years "several federal courts have invalidated the trust rights of unpaid creditors because these creditors agreed . . . after default on payment, to accept payments over time from financially troubled buyers," based on interpretations of 7 C.F.R. § 46.46(e)(2). *Id.* The USDA disagreed with these judicial interpretations of the statute and regulations, stating, "[i]t is our interpretation that § 46.46(e)(2), like paragraph (e)(1) of the regulations . . . addresses pre-transaction agreements only." *Id.* (citations omitted). In explaining the amendment, the USDA emphasized the broad trust rights that PACA provides:

As to U.S. Bank's argument that the notice was too late, the court assumes that U.S. Bank is referring to the PACA notice on the invoices. As discussed below, the court finds that the Invoice Method is an alternative method to preserve PACA rights and the only timing relevant to that method is whether the parties expressly agreed to payment terms beyond thirty (30) days.

### 2.2.2  Invoice Method.

The PACA statute provides for an alternate method to preserve PACA trust rights. Essentially, licensee produce sellers can accomplish this by including language required by the PACA statute on the face of their invoices to notify the buyer that the produce is sold subject to the trust. *See* 7 U.S.C. § 499e(c)(4).[17]

---

> In the context of the PACA trust, the right to make a claim against the trust are vested in the seller, supplier, or agent who has met the eligibility requirements of paragraph (e)(1) and (2) of § 46.46. The seller, supplier, or agent remains a beneficiary of the PACA trust until the debt owed is paid in full as stated in section 5(c)(4) of the statute. An agreement to pay the antecedent debt in installments is not considered payment in full. Thus, we do not believe that a post-default payment agreement should constitute a waiver of a seller's previously perfected trust rights.

*Id.* at 20217–18.

[17] Specifically 7 U.S.C. § 499e(c)(4) states:

> (4) In addition to the method of preserving the benefits of the trust specified in paragraph (3), a licensee may use ordinary and usual billing or invoice statements to provide notice of the licensee's intent to preserve the trust. The bill or invoice statement must include the information required by the last sentence of paragraph (3) and contain on the face of the statement the following: "The perishable agricultural commodities listed on this invoice are sold subject to the statutory trust authorized by section 5(c) of the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499e(c)). The seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received."

MEMORANDUM DECISION . . . ~ Page 15

In this case, evidence was introduced that Chelan Fresh, as marketing agent for Gold Digger, included the statutory PACA language on the invoices. *See, e.g.,* ECF No. 229, Ex. A.[18] Additionally, testimony established that payment terms never exceeded thirty (30) days. Indeed, the invoices for the fruit did not include any payment terms, instead relying on the statutory default of payment "due in 10 days." [ECF No. 229]. Even for large customers there was no agreement in writing to extend payment terms more than thirty (30) days. Although U.S. Bank again argues that the invoice PACA language is not sufficient or timely, the bank fails to support its argument. U.S. Bank relies on two cases in support of its argument, *San Joaquin Food Serv., Inc.*, 958 F.2d 938 and *Flores v. Emerich & Fike (In re Enoch Packing Co., Inc.)*, 386 Fed.Appx. 611 (9th Cir. 2010), both of which can easily be distinguished from the facts here.

In *San Joaquin Food Serv., Inc.*, the parties had a written agreement that extended the payment terms beyond the standard 10-day statutory provision, but the seller failed to include those terms on its invoices. 958 F.2d at 939-40. Thus, the sole issue presented was whether the failure to include the payment term on the invoice resulted in the forfeiture of rights under PACA. The PACA statute, 7 U.S.C. § 499e(c)(3), requires that "[w]hen the parties expressly agree to a payment time

---

[18] The court notes that the invoices to international buyers may not have included this language. However, from the evidence presented, the court finds that the majority of the fruit was sold in the United States and all the invoices for that fruit included the statutory PACA language.

MEMORANDUM DECISION . . . ~ Page 16

period different from that established by the Secretary, a copy of any such agreement shall be filed in the records of each party to the transaction and the terms of payment shall be disclosed on invoices, accountings, and other documents relating to the transaction." *Id.* at 940. The *San Joaquin Food Serv., Inc.* court found that because the parties agreed in writing to extend the payment terms, then the supplier was obligated to comply with the rest of the provision relating to the disclosure of the payment terms on invoices to preserve PACA trust rights. *See id.* at 940. In this case, there is no evidence to suggest that the parties agreed to a payment time different from that established by the Secretary. Because there was no agreement—oral or written—to extend the payment terms beyond the standard ten (10) days, there is no obligation to list the payment terms on an invoice.

In *Enoch Packing Co.* the sellers gave no notice, which is not the case here. Here, it is undisputed that the Non-Member Growers gave notice of their intent to preserve their PACA trust rights (by signing the Non-Member Grower Contract). Thus, unlike *Enoch Packing Co.*, the dispute is the sufficiency, not the existence, of the notice.[19]

---

[19] U.S. Bank also argues that notice was not sufficient because neither the Non-Member Growers nor Gold Digger provided U.S. Bank with notice of the Non-Member Growers' intent to preserve their PACA rights. U.S. Bank cites to "[P]aragraph 10.21 of the Second Amended and Restated Credit Agreement dated June 18, 2014, between U.S. Bank and the Debtor that required [Gold Digger] to provide U.S. Bank with notice if any non-member grower asserted rights under PACA. *See* Proof of Claim 9 (U.S. Bank), Exhibit 1." ECF No. 320, p 33. Although U.S. Bank may have a breach of contract claim against Gold Digger for failure to comply with the contract terms, Gold Digger's failure to give notice to U.S. Bank is not relevant to whether the Non-Member Growers

1    The court finds that all relevant parties knew or should have known that the

2    fruit in question was subject to potential PACA trust claims. Certainly the Non-

3    Member Growers knew, Gold Digger knew, Chelan Fresh knew, and the ultimate

4    buyer knew. The only party declaring it was unaware of the PACA claims is U.S.

5    Bank. However, Gold Digger has a long history with U.S. Bank, and Mr. Nelson

6    testified that, long before this bankruptcy case, he traveled to U.S. Bank's office in

7    Portland, Oregon, to discuss Gold Digger's business with a loan officer.

8        The court finds that the Non-Member Growers provided appropriate notice of

9    their intent to preserve their PACA claims. Written notice was provided to Gold

10   Digger, the commission merchant, through the provisions of the Non-Member

11   Grower Contract. Additionally, buyers were notified by language included on the

12   invoices. Equity and the statute dictate that the Non-Member Growers should be

13   paid their PACA trust claims. Growers here are exactly the type of vulnerable

14   claimants that the PACA and its trust provisions are intended to protect. If the Non-

15   Member Growers' PACA claims were disallowed, this result would be inconsistent

16   with the intent of the parties and the legislative history of the PACA.

17

18

19

20
_____
provided Gold Digger (the commission merchant) notice as to their intent to preserve their PACA
rights.

MEMORANDUM DECISION . . . ~ Page 18

### 3. PURCHASE MONEY SECURITY INTEREST CLAIMS

With respect to the purchase money security interest claims filed by Azzano Farms, Inc., Five Star Orchard and Alvarado Orchards, LLC ("PMSI Claimants"), U.S. Bank argues that these claims should be treated as unsecured because either the entities asserting proofs of claim are different from the entities that were granted purchase money security agreements, or in the alternative, the PMSI Claimants have not met the requirements, as set forth in RCW 62A.9A-203(b), for the creation of an enforceable security agreement.[20]

---

[20] RCW 62A.9A-203(b) provides:

(b) **Enforceability.** Except as otherwise provided in subsections (c) through (i) of this section, a security interest is enforceable against the debtor and third parties with respect to the collateral only if:

(1) Value has been given;

(2) The debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and

(3) One of the following conditions is met:

(A) The debtor has authenticated a security agreement that provides a description of the collateral and, if the security interest covers timber to be cut, a description of the land concerned;

(B) The collateral is not a certificated security and is in the possession of the secured party under RCW 62A.9A-313 pursuant to the debtor's security agreement;

(C) The collateral is a certificated security in registered form and the security certificate has been delivered to the secured party under RCW 62A.8-301 pursuant to the debtor's security agreement; or

(D) The collateral is deposit accounts, electronic chattel paper, investment property, letter-of-credit rights, or electronic documents, and the secured party has control under RCW 62A.7-106, 62A.9A-104, 62A.9A-105, 62A.9A-106, or 62A.9A-107 pursuant to the debtor's security agreement.

### 3.1 PMSI Claimants are the same as, or are predecessors of, the Growers.

U.S. Bank argues that the PMSI Claimants do not have secured claims because the claimants are distinct from the entities who were granted security interests in fruit sold to Gold Digger. Based on the evidence presented, the court disagrees. Rather, the evidence presented by the PMSI Claimants shows that the entities are so intertwined and share so many commonalities that they cannot be separated and should be treated as successor entities. *See* WASH. REV. CODE § 62A.1-103 (noting that principles of equity supplement U.C.C. provisions unless specifically displaced). Additionally, a successor to a secured claim need not re-perfect a lien. *See Hergert v. Bank of the West (In re Hergert)*, 275 B.R. 58 (2002). Therefore, this court rejects U.S. Bank's argument that the PMSI Claimants are not the entities that now hold rights as secured creditors.[21]

---

[21] U.S. Bank has not supported its conclusory allegations with any meaningful legal argument or citation to relevant authority. Absent adequate, cogent argument and briefing, this court can decline to consider an argument. *See Saunders v. Lloyd's of London*, 113 Wash.2d 330, 345, 779 P.2d 249, 257 (1989), and *Spark Networks, PLC v. Knedlik*, 155 Wash. App. 1024 (2010). With respect to its entity argument, U.S. Bank cites to only one case (the "*Wade Cook*" case), and that case involves a different factual situation. *See The Stock Market Inst. of Learning, Inc. v. Carey (In re Wade Cook Fin. Corp.)*, 375 B.R. 580, 598-599 (B.A.P. 9th Cir. 2007). The *Wade Cook* case, unlike here, involved the question of whether, for liability purposes, the corporate veil between a parent corporation and its subsidiary corporation should be pierced. Here, the issue is not which entity should be held liable, rather the issue is whether the PMSI Claimants are the successors to the parties that were named in the security agreements. Moreover, even if this case involved piercing the corporate veil, the court notes that in Washington the question of whether the corporate form should be disregarded is a question of fact. *See Truckweld Equip. Co., Inc. v. Olson*, 26 Wash. App. 638, 643, 618 P.2d 1017, 1021 (1980).

The court finds that although the names may have changed slightly as to the PMSI Claimants, U.S. Bank could not have been materially led astray by the changes. *See In re Copper King Inn, Inc.*, 918 F.2d 1404 (9th Cir. 1990) (explaining that the accuracy of a secured party's name is relevant only if a hypothetical creditor could be materially led astray by an error in, or omission of, the secured party's name).[22] In connection with the business conducted with Gold Digger, the court finds that: (1) Azzano Farms, Inc. is the successor to, and holds all the business assets of, Azzano Orchards, LLC; (2) Five Star Orchard is the successor to, and holds all the business assets of, R&B Orchard; (3) Alvarado Orchards, LLC is the successor to, and holds all the business assets of, Miguel Alvarado. The court highlights some of the relevant facts below.

First, Azzano Farms, Inc. filed proof of claim number 32, but it was Azzano Orchards, LLC named in the Joinder Agreement, named in the Marketing Contract, and named as the secured party on the UCC financing statement. However, Gary Azzano was the owner and operator of both Azzano Orchards, LLC and Azzano Farms, Inc. Azzano Orchards, LLC and Azzano Farms, Inc. conducted the same business, and the "Inc." was the successor to all of the "LLC's" assets and business operations. Moreover, the transition from "LLC" to "Inc." is not a surprise to any of

---

[22] As a practicable matter, the name of the debtor is what is important on financing statements because interested parties normally search by a debtor's name.

MEMORANDUM DECISION . . . ~ Page 21

the parties because the transition was formally approved by the Gold Digger Board of Directors on January 14, 2015. Lastly, no party argued that the address used for Azzano Farms, LLC and Azzano Farms, Inc. are different.

Second, Five Star Orchard filed proof of claim number 43 and is named as the secured party in the UCC financing statement, but it was R&B Orchard named in the Joinder Agreement and in the Marketing Contract. However, Five Star Orchard and R&B Orchard are both general partnerships, with Rigoberto Guzman as a general partner and the manager. Additionally, on June 2, 2014, Mr. Guzman sent a letter to Gold Digger requesting the name of his business be changed from R&B Orchard to Five Star Orchard, and Gold Digger's Board of Directors approved the name change at a regularly conducted meeting held on August 26, 2014. [ECF No. 207, Exs. 3 & 5]. The type of business operated under the names of R&B Orchard and Five Star Orchard are the same and the operating assets are the same. There are only two partners in Five Star Orchard, and those two partners were two of the three partners in R&B Orchard. The third partner in R&B Orchard was bought out by the other two and did not take with him any of the operating assets. Lastly, no party argues that the addresses used for Five Star Orchard and R&B Orchard are different than that of Mr. Guzman.

Finally, as to Alvarado Orchards, LLC, in 2012, it was Miguel Alvarado who signed the Marketing Contract and the Joinder Agreement, and who is named as the

secured party on the UCC financing statement. Mr. Alvarado's business has never changed, but in 2014 the name of the business became Alvarado Orchards, LLC, which is owned and managed by Mr. Alvarado. On August 26, 2014, Gold Digger's Board of Directors recognized and approved the change from Miguel Alvarado to Alvarado Orchards, LLC. Proof of claim number 54 was filed in the name of Alvarado Orchards, LLC, which the court finds to be the successor to the business of Miguel Alvarado. Lastly, no party argues that the address used for Miguel Alvarado is different from the one used for Alvarado Orchards, LLC.

The three above-described successions were well known to the representatives of Gold Digger and any interested party, like U.S. Bank, that took reasonable steps to monitor Gold Digger's business operations. No credible evidence was presented that convinced this court that a party may have been led astray by the name changes and successions of the PMSI Claimants. In sum, every interested party understood that the PMSI Claimants, as successors to the parties named in the original agreements, held a valid security interest in fruit sold to Gold Digger.

### 3.2.  **The PMSI Claimants hold valid and perfected security interests.**

U.S. Bank argues, even if the court finds the PMSI Claimants are successors to the entities that signed the original contracts, the PMSI Claimants should be treated as unsecured because none of them have met the requirements of RCW 62A.9A-203(b) to perfect their security interest. The court disagrees.

### 3.2.1  **The three operative agreements**.

There are three operative agreements for each PMSI Claimant: (1) an Intercreditor Agreement, with an effective date of December 31, 2011, that was signed by both Gold Digger and U.S. Bank; (2) a Joinder Agreement that was signed by each PMSI Claimant, or predecessor, in order for each PMSI Claimant to become a party to the Intercreditor Agreement; and (3) a Grower's Marketing Contract ("Marketing Contract") that was signed by Gold Digger and each PMSI Claimant or predecessor. Also, each of the PMSI Claimants filed a UCC financing statement.

The Intercreditor Agreement provides on the first page, in part B of the "Background" section, that:

> The Grower Obligations are secured by purchase money security interests in Borrower's fruit inventory to the extent purchased from the Growers and the proceeds thereof.

Section 2 of the Intercreditor Agreement provides:

> 2.    _Full Force and Effect of Liens_. Except as otherwise expressly provided in this Agreement, the Bank Liens and the Grower Liens and the rights and obligations of the Parties hereto will remain in full force and effect irrespective of:
>
> (a)    How a Lien was acquired, whether by grant, possession, statute, operation of law, subrogation, or otherwise;
>
> (b)    The time, manner or order of the grant, attachment, or perfection of a Lien;

(c)     Any conflicting provision of the applicable Uniform Commercial Code or other applicable law;

(d)     Any defect in, or non-perfection, setting aside, or avoidance of, a Lien or any document evidencing the Bank Obligations or any document evidencing the Grower Obligations;

(e)     The modification of the Bank Obligations or the Grower Obligations;

(f)     The subordination of any of the Bank Liens on Common Collateral to a Lien securing another obligation of the Borrower or other Person that is permitted under the Bank Documents or that secures a DIP Financing deemed consented to by the Growers hereunder;

(g)     The commencement of an Insolvency Proceeding; or

(h)     Any other circumstances whatsoever, including a circumstance that might be a defense available to, or a discharge of, the Borrower in respect of the Bank Obligations (or holder thereof) or any of the Grower Obligations (or holders thereof).

Section 3.2 of the Intercreditor Agreement provides for a "waterfall" provision.[23] This provision sets forth the order in which U.S. Bank and the growers

---

[23] Section 3.2 of the Intercreditor Agreement provides:

3.2     Waterfall. Until the Discharge of the Bank Obligations, with respect to the sale of all or any portion of any Pool of Common Collateral by the Borrower [Gold Digger] to a third party, the Borrower will apply the sale proceeds as follows:

(a)     *first*, promptly following the Borrower's receipt of the proceeds from the sale of a Pool of Common Collateral or any portion thereof, to the Bank in an amount as of the date of such sale equal to the sum of: (i) the actual GDA Charges [which is defined to include marketing and packing charges] allocated to such Pool of Common Collateral; plus (ii) all other amounts deducted from such

are to be paid and was used by Ms. DeVon to calculate the GAE Amounts. U.S.

Bank is to be paid first from the actual marketing and packaging charges allocated to

the common collateral, and then the net proceeds from the fruit are available for the

growers.

Section 6.1 of the Intercreditor Agreement provides that "[t]he Bank will not

contest in any proceeding (including, without limitation, an Insolvency Proceeding)

the validity, enforceability, perfection, or priority of any Grower Liens on the

Common Collateral."[24]

---

proceeds in calculating the Growers' Net Proceeds with respect to such Pool of Common Collateral; and

(b)      *second*, following the Borrower's receipt of the proceeds from the sale of a Pool of Common Collateral or any portion thereof and after payment of all amounts referred to in Section 3.2(a), to the applicable Growers in an amount equal to the Growers' Net Proceeds; provided, however, that all interim, partial distributions to Growers pursuant to this clause (b) that are made prior to the closure of the applicable Pool of Common Collateral will, consistent with past practice, be made in such an amount as to ensure that upon closure of such Pool of Common Collateral the Bank will have been paid all amounts referred to in Section 3.2(a).

[24] Section 1.5 provides:

1.5      "Common Collateral" means all fruit inventory of the Borrower purchased from one or more of the Growers, including, without limitation, the proceeds thereof, that secures (or is required to secure) both the Bank Obligations and the Grower Obligations; provided, however, that the Common Collateral does not include any fruit inventory of the Borrower that was grown by the Borrower or purchased by the Borrower from a Person other than a Grower.

MEMORANDUM DECISION . . . ~ Page 26

The Joinder Agreement, in the form attached to the Intercreditor Agreement and approved by U.S. Bank, was signed by the predecessors of the three PMSI Claimants, and provides:

> 2. <u>Binding Obligation</u>. The Grower acknowledges and agrees that the Intercreditor Agreement constitutes the legal, valid, and binding obligation of the Grower, U.S. Bank, and Borrower in accordance with its terms.

The Joinder Agreement was signed by: Gary Azzano on behalf of Azzano Orchards on December 10, 2011 [ECF No. 191, Ex. 2]; Rigoberto Guzman on July 29, 2013, as a general partner of R&B Orchard, which is the predecessor to Five Star Orchard in which Mr. Guzman is also a general partner [ECF No. 207, Ex. 2]; and Miguel Alvarado, the owner and manager of Alvarado Orchards, LLC, on June 11, 2012 [ECF No. 222, Ex. 2].

The Marketing Contract, in the form approved by U.S. Bank, and in the form signed by Gold Digger and the predecessors of the three PMSI Claimants, provides:

> 2. **<u>Fruit Covered by Contract</u>**:  During the term of this Contract and subject to its provisions, the Company agrees to purchase and Grower agrees to sell to the Company at such place(s) and time(s) as the Company shall determine the fruit grown by Grower of the types and varieties and on the property identified in paragraph 20 below (the "Fruit"). The sale of the Fruit to the Company shall occur upon the delivery and shall be subject to the Grower's security interest in the Fruit as more fully set forth in Paragraph 4 below.
> ….

1    4.    **GRANT OF SECURITY INTEREST FROM**
**COMPANY TO GROWER:** TO SECURE
2     PERFORMANCE AND PAYMENT OF ALL PRESENT
AND FUTURE DEBTS, OBLIGATIONS OR
3     EVIDENCES OF INDEBTEDNESS OF THE COMPANY
TO GROWER, THE COMPANY HEREBY GRANTS TO
4     GROWER A SECURITY INTEREST IN AND
MORTGAGES ALL FRUIT OF THE COMPANY SOLD
5     BY THE GROWER TO THE COMPANY TOGETHER
WITH ALL ACCOUNTS RECEIVABLE, CHATTEL
6     PAPER, INSURANCE PROCEEDS AND OTHER CASH
PROCEEDS FROM THE SALE OF SUCH
7     INVENTORY. THE COMPANY SHALL INCLUDE
THE NAME OF THE GROWER AS AN ADDITIONAL
8     INSURED UNDER ALL INSURANCE POLICIES
COVERING THE GROWER'S COLLATERAL.

9

10   The Marketing Contract was signed by: Gold Digger and Gary Azzano on behalf of

11   Azzano Orchards on December 10, 2011; Gold Digger and Rigoberto Guzman, who

12   is a general partner in both R&B Orchard and Five Star Orchard, on May 28, 2013;

13   and Gold Digger and Miguel Alvarado on June 11, 2012.

14       **3.2.2   PMSI Claimants provided value.**

15           U.S. Bank asserts that the requirements of RCW 62A.9A-203(b)(1) were not

16   met by any of the PMSI Claimants because none of them provided value to Gold

17   Digger. This argument lacks merit. Based on numerous declarations, testimony at

18   the January 19, 2017 hearing, and the proofs of claim, the court finds that substantial

19   value was provided to Gold Digger by each of the PMSI Claimants or their

20

predecessors.[25] This finding that the PMSI Claimants provided value is based on Gold Digger's records that were prepared by Ms. DeVon, a competent and trusted certified public accountant. Gold Digger's records show: $77,148.57 is owed to Azzano Farms, Inc.; $15,211.71 is owed to Five Star Orchard; and $12,839.26 is owed to Alvarado Orchards, LLC. In sum, all of the PMSI Claimants or their predecessors provided value to Gold Digger.

### 3.2.3  **Adequate description of collateral.**

U.S. Bank also argues that the PMSI Claimants' agreements did not adequately describe the collateral. Based on the careful reading of the parties' agreements, and consideration of the testimony, the court finds that all of the requirements for a valid security agreement, including an adequate description of the collateral, exist for each of the PMSI Claimants. Moreover, the description of the collateral included in each of the security agreements proved workable – Ms. DeVon was able to use the parties' agreements and documents to allocate collateral proceeds from the sale of fruit to the three PMSI Claimants.

### 3.2.4  **The PMSI Claimants perfected prior to Gold Digger's bankruptcy.**

The security agreements for all of the PMSI Claimants were perfected, prior to Gold Digger's bankruptcy, by the filing of UCC financing statements with the

---

[25] As noted earlier, the names of the PMSI Claimants are not always the same as the names of the fruit growers who signed agreements with Gold Digger, but as discussed, the PMSI Claimants are successors to the fruit growers who are named in the agreements with Gold Digger.

1 Washington State Department of Licensing. The financing statement, which named

2 Azzano Orchards, LLC as the secured party, was filed on June 28, 2012, the

3 financing statement for Five Star Orchard was filed on March 7, 2016, and the

4 financing statement for Miguel Alvarado was filed on June 28, 2012. Each financing

5 statement names Gold Digger as the debtor and describes the collateral as:

6       All inventory, including fruit, sold by the Secured Party to
      the above referenced Debtor [Gold Digger], together with

7       all accounts receivable, chattel paper, insurance proceeds
      and other cash proceeds from the sale of such fruit

8       inventory.

9 Also, and importantly, each UCC financing statement included a provision for an

10 acknowledgment copy to be sent to U.S. Bank.

11      Between the Intercreditor Agreements, Joinder Agreements, Marketing

12 Contracts, and UCC financing statements, the court finds that each PMSI Claimant

13 has a valid, and perfected, security agreement.

14 ### 3.2.5  U.S. Bank waived the requirement for authenticated notification.

15      U.S. Bank also argues that PMSI Claimants' liens are junior to the lien of U.S.

16 Bank because there was no "authenticated notification" of the PMSI liens as

17 required by RCW 62A.9-324(b).[26] However, U.S. Bank's argument does not take

---

[26] RCW 62A.9-324(b) provides:

    (b) **Inventory purchase-money priority.** Subject to subsection (c) of this
section and except as otherwise provided in subsection (g) of this section, a
perfected purchase-money security interest in inventory has priority over a
conflicting security interest in the same inventory, has priority over a conflicting
security interest in chattel paper or an instrument constituting proceeds of the

into account: (1) the fact that the three PMSI Claimants' financing statements show that an acknowledgment copy was sent to U.S. Bank; and (2) RCW 62A.1-102(3) and sections 2 and 3.2 of the Intercreditor Agreement provide for a waiver of the notification requirement.

RCW 62A.1-102(3) provides a general rule that provisions in the Uniform Commercial Code (such as RCW 62A.9-324(b) the provision U.S. Bank relies on in this case) may be "varied by agreement." That is exactly what happened here. As set forth above, section 2 of the Intercreditor Agreement specified that the provisions of the Intercreditor Agreement "will remain in full force and effect irrespective of … [a]ny conflicting provision of the applicable Uniform Commercial Code or other applicable law." Moreover, section 3.2, the "waterfall" provision, provides that the growers' claims are senior to those of U.S. Bank to all of the proceeds from the sale

---

inventory and in proceeds of the chattel paper, if so provided in RCW 62A.9A-330, and, except as otherwise provided in RCW 62A.9A-327, also has priority in identifiable cash proceeds of the inventory to the extent the identifiable cash proceeds are received on or before the delivery of the inventory to a buyer, if:

    (1) The purchase-money security interest is perfected when the debtor receives possession of the inventory;

    (2) The purchase-money secured party sends an authenticated notification to the holder of the conflicting security interest;

    (3) The holder of the conflicting security interest receives the notification within five years before the debtor receives possession of the inventory; and

    (4) The notification states that the person sending the notification has or expects to acquire a purchase-money security interest in inventory of the debtor and describes the inventory.

of fruit other than those proceeds attributable to specific charges, such as the "GDA Charges" that result from Gold Digger storing and packing the fruit.[27]

The court finds that U.S. Bank was given notice of the PMSI claims and waived any objection to the PMSI Claimants' right to a priority as set forth in the "waterfall" provision that was used in calculating the GAE Amounts. Therefore, U.S. Bank's argument, which is based on RCW 62A.9-324(b), is not supported by the evidence presented.

### 3.3    U.S. Bank cannot avoid a preferential transfer.

Finally, U.S. Bank argues that the secured claim of Five Star Orchard should be avoided because Five Star Orchard's UCC financing statement was filed within 90 days before Gold Digger filed its bankruptcy petition. Although U.S. Bank's claim objections are voluminous, this particular objection is limited to two sentences. The objection in its entirety is:

> Five Star Orchard provides a copy of a UCC financing statement that was filed with the Washington Department of Licensing on March 7, 2016. That filing was made within 90 days of the petition date of May 26, 2016, and is avoidable under 11 U.S.C. section 547 to the extent that is

---

[27] The Intercreditor Agreement provides:

1.10    "GDA Charges" means, determined consistent with past practice, with respect to each Pool of Common Collateral, marketing charges, warehouse charges (including, without limitation, "in charges" and "packing charges"), industry charges, credit carry forwards and other deductions or charges assessed or set off by the Borrower against the Growers with respect to the applicable Pool of Common Collateral pursuant to the applicable Grower's Marketing Contracts and all rules, regulations, terms, and conditions to which the Borrower's members are subject.

comprised a transfer of an interest of the Debtor in property.

[ECF No. 320, p. 16, ll. 11-15]. Five Star's response is equally brief:

> The Bank argues that any financing statement filed by a Grower within 90 days of the petition date is avoidable under 11 U.S.C. § 547. However, the Bank ignores the exceptions to the preference rules in 11 U.S.C. § 547(b)(2) and 11 U.S.C. § 547(c)(2)(A) and (B).

[ECF No. 342, p. 12, ll. 3-6].

Neither U.S. Bank nor Five Star Orchard focused their argument on the text of 11 U.S.C. § 547, which provides in section (b) that it is "the trustee [who] may avoid any transfer" as a preference. Since U.S. Bank is not the trustee in this case, the court dismisses U.S. Bank's objection without having to review the exceptions to the preference rules raised by Five Star Orchard.

## 4. CLAIM AMOUNTS

Four claimants filed a timely proof of claim in an amount that exceeded the GAE Amount determined by Roni DeVon. Because the court finds the best evidence as to the amount of claims is the impartial report prepared by Roni DeVon, the court concludes that: the secured claim of Azzano Farms, Inc. should be limited to the GAE Amount of $77,148.57; the PACA claim of Santos Alvarez should be limited to the GAE Amount of $4,172.68; the secured claim of Alvarado Orchards, LLC

should be limited to the GAE Amount of $12,839.26; and the PACA claim of Parm

Dhaliwal should be limited to the GAE Amount of $2,515.41.

In the four other instances, the claimant timely filed a proof of claim in an

amount less than the GAE Amount, but then, more than two months prior to the

hearing, but after the claims bar date, filed an amended claim equal to the GAE

Amount. The amended proofs of claim changed the amounts slightly after the

claimants had the benefit of Roni DeVon's accounting, but were similar in all other

respects. As a result, the court finds that the original claim provided fair notice of the

conduct, transactions, and occurrences that formed the basis of the amended claim.

In such instances, it has long been established in the Ninth Circuit that an

amendment to a timely filed proof of claim "relates back" to the filing date of the

original. *See*, *e.g.*, *In re Jackson*, 541 B.R. 887, 891 (B.A.P. 9th Cir. 2015).

Therefore, the court concludes that: the PACA claim of David Ramos should be

allowed in the amount of $106,495.87; the secured claim of Five Star Orchard

should be allowed in the amount of $15,211.71; the PACA claim of Austin Orchard

should be allowed in the amount of $1,651.27; and the PACA claim of Elias

Sandoval should be allowed in the amount of $23,423.12.

## 5. <u>CONCLUSION</u>

Based on the reasons set forth above, the court will enter an order allowing the

PACA claims and the PMSI secured claims in the amounts identified above. At this

1 time, the court renders no opinion on any party's right to attorney fees. Requests for

2 attorney fees, if any, can be made by subsequent motion.

3 ///END OF MEMORANDUM DECISION///